**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 20 2017

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

JOY HURT, on behalf of herself and
all others similarly situated,

        Plaintiff,

v.

SHELL OIL COMPANY (d/b/a SHELL
CHEMICAL COMPANY) and CELANESE
CORPORATION,

        Defendants.

CASE NO. 3:17-CV00315 DPM

**COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

This case assigned to District Judge Marshall
and to Magistrate Judge Volpe

Plaintiff, Joy Hurt, by and through undersigned counsel, on behalf of herself and all other

persons and entities similarly situated (the "Class" or "Class members"), brings this class action

against Defendants, Shell Oil Company (d/b/a Shell Chemical Company) and Celanese

Corporation. For her Class Action Complaint, Plaintiff alleges, upon information and belief and

based on the investigation to date of counsel, as follows:

## NATURE OF ACTION

1.     This is a class action seeking damages and declaratory relief in connection with

defective water delivery systems designed, manufactured, marketed, advertised, and sold by

Defendants in the State of Arkansas and throughout the United States.

2.     At all times material hereto, Defendants designed, engineered, produced,

manufactured, and/or sold polybutylene ("PB") resin and acetal materials for use in the

manufacture of polybutylene ("PB") pipe and other plumbing components.

3.     Defendants marketed and promoted PB resin and water delivery systems

employing such material, wherein they represented to consumers that these water delivery

systems were durable, reliable, free from defects, and appropriate for use in Plaintiff's and Class

1

members' homes and other structures.

4.      Contrary to Defendants' representations, these water delivery systems were and are defective and problematic. The PB piping and acetal fittings used in these systems degrade, corrode, crack, and leak, causing damage to Plaintiff's and Class members' structures and property.

5.      The defect alleged herein was also subject of a 1995 settlement with Defendants. *See Cox v. Shell Oil Co.*, No. 18,844 (Tenn. Ch. Ct. Obion Cnty. 1995); *see also Beeman v. Shell Oil Co.*, No. 93-047363 (Tex. Dist. Ct. Harris Cnty., filed Sept. 1993); *Spencer v. Shell Oil Co.*, No. CV-94-074 (Ala. Cir. Ct. Greene Cnty., filed Nov. 1994) (related cases).

6.      Plaintiff seeks relief on behalf of a Class of real property owners who were excluded from and whose rights were not affected by the prior settlement.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (i.e., Plaintiff is a citizen of Arkansas and both Defendants are incorporated in Delaware and maintain their principal places of business in Texas), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars), exclusive of interest and costs, and (iii) there are 100 or more members of the proposed Class.

8.      Defendants conduct substantial business in Arkansas, including the sale and distribution of the PB resin and the marketing and promotion of the water delivery systems, and have sufficient contacts with Arkansas, or otherwise intentionally availed themselves of the laws and markets of Arkansas, so as to sustain this Court's jurisdiction over Defendants.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial

2

part of the events or omissions giving rise to this claim occurred in this District, a substantial part of the property that is the subject of this action is situated in this District, and Defendants are subject to personal jurisdiction in this District.

10.     In marketing, distributing, promoting, and selling the water delivery systems to purchasers throughout Arkansas, either directly or indirectly through third parties or related entities, Defendants have benefitted from Arkansas laws and profited from Arkansas commerce.

## PARTIES

11.     Plaintiff owns a home located at 905 Baywood Drive, Paragould, AR 72450.  The home, which she purchased in 2005, contains a defective water delivery system manufactured by Defendants.  Ms. Hunt was unaware of Defendants' misrepresentations until February 2017, when a portion of plumbing in her home failed, causing substantial water damage.

12.     Defendant Shell Oil Company, doing business as Shell Chemical Company ("Shell"), is a corporation organized under the laws of the State of Delaware and authorized to do business in the State of Arkansas, with its principal place of business in Houston, Texas.

13.     Defendant Celanese Corporation ("Celanese"), is a corporation organized under the laws of the State of Delaware, with its principal place of business in Irving, Texas.

## DEFINITIONS

14.     In this Complaint, the terms "plastic water delivery system(s)" and "water delivery system(s)" refer to water supply plumbing containing, among other things, pipes fabricated, in whole or in part, from polybutylene, and fittings, including tees, elbows, and couplings, fabricated whole or in part, from acetal copolymers, whether sold and/or installed as a system or as separate pieces.  The terms "plastic water delivery system(s)" and "water delivery system(s)" include both water pipes used to connect water meters to the curb stop running from

3

the water main, and interior plumbing, including without limitation, polybutylene ("PB") pipes and acetal fittings.

15.    In this Complaint, the terms "structures" and "improvements to real property" are intended to be broadly inclusive and shall include, without limitation, both underground plumbing lines and residential buildings, such as homes, apartments, condominiums, manufactured housing, and mobile homes.

16.    In this Complaint, whenever it is alleged that any Defendant did any act or thing, it is meant that such Defendant's officers, agents, servants, employees, attorneys, or representatives did such act or thing and that, at the time such act or thing was done, it was done with the full express, implied, or apparent authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of the Defendant's officers, agents, servants, employees, attorneys, or representatives.

17.    Various other individuals and corporations not made Defendants in this lawsuit may have participated as co-conspirators with the Defendants in the offenses charged herein and may have performed acts and made statements in furtherance thereof.

**PRIOR SETTLEMENT**

18.    In or around 1995, a nationwide settlement was reached based on the same defect alleged herein, with the settlement class defined as follows:

> All persons and entities that (1) own structures and/or improvements to real property in the United States in which there is a polybutylene plumbing system, (2) own or previously owned such structures and/or improvements to real property and have already incurred any cost or expense, by reason of leakage from, or from failure, repair, or removal of, all or any portion of a polybutylene plumbing system, or (3) will own such structures and/or improvements during the term of entitlement to relief under the Settlement Agreement.
>
> The Settlement Class definition excludes:
>
> (1) all claims for personal injury and associated emotional distress,

4

(2) all compensatory claims by *any person who is not an Eligible Claimant* under the Settlement ....

*See* Order Granting Preliminary Approval To Proposed Settlement, Approving Class Action Settlement Notice Program at 3, *Cox v. Shell Oil Co.*, No. 18,844 (Tenn. Ch. Ct. Obion Cnty. July 31, 1995) (emphasis added) (attached at Exhibit A).

19.    The "Eligible Claimant" designation referenced in this definition was dependent upon the presence of a "Qualifying Leak," a term which encompassed (1) leaks occurring before August 21, 1995, and (2) leaks occurring after said date and within 10 to 16 years of the piping's installation (the applicable time period depending on the type of dwelling and components involved). *See* Settlement Agreement at § 6.1, *Cox v. Shell Oil Co.*, No. 18,844 (Tenn. Ch. Ct. Obion Cnty. July 31, 1995) (attached at Exhibit B); *see also Guidelines*, Polybutylene Plumbing & Pipe Replacement: Polybutylene Lawsuit & Class Action Settlement Information, http://www.polybutylenelawsuit.com/guidelines.htm (last visited Nov. 1, 2017).

20.    The Class herein, as fully defined below, is composed of persons and entities that have been injured by the same defect but were not Eligible Claimants entitled to relief under the prior settlement.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action individually and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all others similarly situated. The proposed Class is defined as follows:

**MULTI-STATE CLASS**
**All persons and entities that presently own structures and/or improvements
to real property in Arkansas, Arizona, California, the District of Columbia,
Hawaii, Louisiana, Maine, Massachusetts, Mississippi, Missouri, Montana,
Nevada, New Hampshire, New Jersey, New Mexico, North Dakota,
Pennsylvania, Rhode Island, South Dakota, Utah, Vermont, Virginia, West
Virginia, and Wyoming in which there is a polybutylene plumbing system,
and all persons or entities that own or previously owned such structures
and/or improvements and incurred any cost or expense by reason of
leakage from a failure, repair, or removal of, all or any portion of a "plastic
water delivery system."**

**Excluded from the Multi-State Class are all persons and entities that were
Eligible Claimants with respect to the settlement in *Cox v. Shell Oil Co.*, No.
18,844 (Tenn. Ch. Ct. Obion Cnty. 1995).**

22.    Additionally or alternatively, Plaintiff brings this case on behalf on herself and all

others similarly situated in Arkansas, a subset of the Multi-State Class defined as follows:

**ARKANSAS SUBCLASS**
**All persons and entities that presently own structures and/or improvements
to real property in the State of Arkansas in which there is a polybutylene
plumbing system, and all persons or entities that own or previously owned
such structures and/or improvements and incurred any cost or expense by
reason of leakage from a failure, repair, or removal of, all or any portion of
a "plastic water delivery system."**

**Excluded from the Arkansas Subclass are all persons and entities that were
Eligible Claimants with respect to the settlement in *Cox v. Shell Oil Co.*, No.
18,844 (Tenn. Ch. Ct. Obion Cnty. 1995).**

23.    Also excluded from both the Multi-State Class and the Arkansas Subclass

(hereinafter, collectively, the "Class") are any personal injury claims and claims by any

Defendant; any Defendant's parent companies, subsidiaries, affiliates, or other entities that

control or are controlled by either Defendant; and the officers, directors, agents, servants, and

employees of the same and their immediate families.

24.    Plaintiff reserves the right to re-define the Class prior to class certification.

25.    The Class is composed of hundreds or potentially thousands of property owners

and accordingly, is so numerous that joinder of all members is impracticable.

26.     Plaintiff is a member of the Class she seeks to represent.  Plaintiff's claims are typical of the claims of the Class because Plaintiff and all other Class members will or have sustain(ed) damages and injuries caused by the defective polybutylene plumbing systems.

27.     Plaintiff will fairly and adequately represent the interests of the Class, has no interests contrary to or in conflict with those of the Class, and has retained attorneys experienced in the prosecution of complex class action litigation and polybutylene litigation.

28.     Common questions of law and fact exist as to all members of the Class, and predominate over any individual questions.  Among such common questions of law and fact are:

> a.  **Whether the plastic water delivery systems are defective in design and/or manufacture;**
>
> b.  **Whether Defendants knew or should have known of the defects;**
>
> c.  **Whether Defendants concealed the defects from Plaintiff and the Class members at the time of sale;**
>
> d.  **Whether Defendants violated the Arkansas Deceptive Trade Practices Act;**
>
> e.  **Whether Defendants were negligent in formulating, designing, or manufacturing the product or failing to warn consumers of the defect,**
>
> f.  **Whether Defendants are strictly liable to Plaintiff and the Class; and**
>
> g.  **Whether Plaintiff and the Class members are entitled to damages.**

29.     Given the scope of harm inflicted by Defendants, the prosecution of separate actions by the individual Class members would create a risk or adjudications that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interests.

30.     A class action is superior to other available means for the fair and efficient

adjudication of the claims presented by this Complaint.

31.     Accordingly, the proposed Class fulfills the certification criteria of Rule 23 and certification thereof is appropriate under one or more of the provisions of Rule 23.

## FACUTAL ALLEGATIONS COMMON TO ALL CLAIMS

32.     In the late 1970's, Shell and Celanese, among others, acted together in the development, engineering, and/or marketing of plastic water delivery systems.

33.     Plastic water delivery systems were a departure from the normal use of copper pipe for such applications. This product was a new and mostly untested change for which code approval was necessary.

34.     Shell designed, engineered, produced, manufactured, marketed, and promoted PB resin, particularly for use in the manufacture of PB pipe for plastic water delivery systems. Shell sought to create a market for its resins by orchestrating coordinated industry effort to obtain regulatory code approval to use PB pipe and fittings in residential water delivery systems. Shell, in fact, contributed monies toward some manufacturers' advertising expenses.

35.     Celanese designed, engineered, produced, manufactured, marketed, and promoted an acetal resin, under the trademark "Celcon," particularly for use in the manufacture of fittings for plastic water delivery systems.

36.     Celanese represented to various manufacturers of plumbing pipe and plumbing fittings and to the public, including Plaintiff and the Class members, that Celcon was suitable for use in domestic potable water systems; would be reliable; would have a long life when used in such plumbing systems; and was a fit and proper material for use in fittings in such systems.

37.     Celanese failed to disclose that its product, Celcon, would degrade or corrode and ultimately fail when exposed to the chemicals it knew existed in ordinary drinking water. Even

after fitting failures had been reported to Celanese, it continued to represent to its customers and the public, including Plaintiff and the Class, that the Celcon material and plumbing parts made from Celcon were acceptable for their intended use.

38.     Shell and Celanese touted PB pipe and "plumbing systems," including insert acetal fittings, across the country, to builders, developers, plumbing distributors, plumbers, code officials, governmental plumbing regulatory bodies, and other buyers and users of plumbing parts, as well as to the public, including Plaintiff and the Class members.     Defendants represented that the "polybutylene plumbing system" and its component parts would last the normal lifetime of the buildings in which the system was installed; that such system could be correctly installed easily and inexpensively using any one of four proven connection methods; that the system and its components would not degrade or corrode; and that the system had characteristics and benefits well in excess of any other system of plumbing sold in America.  All such representation were, and Defendants knew them to be, false.

39.     In the late 1970s to early 1980s, Defendants targeted the residential home market for sales of plastic water delivery systems. Shell concluded that pipe manufacturers, creating their products with Shell-supplied material, could sell this experimental water delivery system to home builders.  From about 1977 forward, sales teams composed of representatives from Shell and, on occasion, certain pipe manufacturers, undertook a nationwide lobbying effort to convince home builders, city officials, and entities responsible for formulating and promulgating building codes to allow this new system to be installed as an indoor hot-and-cold water system in new structures and other improvements to real property such as those of the Plaintiff herein.  Shell's promises of outstanding quality, low cost, long service life, easy installation, corrosion/ degradation resistance, and other benefits were accepted by many but were without foundation.

In essence, Defendants used the American public as a test group to see if they could develop a new and different plumbing system from which they might, and in fact did, derive substantial new revenue.

40.     In order to obtain regulatory approvals and convince builders and plumbers to use PB pipe and acetal fittings, Shell and Celanese, among others, represented to builders, plumbers, and various regulatory bodies, and, through them, the consuming public, that plastic water delivery systems were cheaper, more durable, and easier to install that traditional copper piping, in addition to the other representations described below.  Shell represented to various pipe manufacturers and testing and to industry code authorities that polybutylene was suitable for use in domestic potable water systems; would be reliable; would have a long life when used in such systems; and was a fit and proper material for use in fabricating plumbing pipe.  Shell failed to disclose that polybutylene would degrade or corrode and ultimately fail when exposed to chemicals found in ordinary drinking water. Even after failures had been reported to Shell, the company continued to represent to its customers and others, including the Class members, that polybutylene was an acceptable material for use in plumbing pipe.

41.     Without regulatory approval, the pipe and fittings could not have been used in Plaintiff's home. Defendants held themselves out to builders, plumbers, regulatory bodies, and the general public as possessing special expertise in the design and manufacture of these products, and Defendants intended that builders, plumbers, and regulatory bodies rely upon their representations in selecting and approving the materials for use.  Defendants knew that builders and plumbers selected such materials and that home buyers relied upon such builders and plumbers, as their agents, to make such selections.

42.     Relying on the Defendants' express representations and failure to disclose the

products' problems, regulatory agencies, as governmental representatives of the consuming public, approved the use of PB pipe and acetal fittings for residential use in or about 1980 and 1982, for exterior and interior applications, respectively.  Defendants expressly represented to the public, including Plaintiff, that the products had been tested extensively and were suitable for use in their structures.

43.    Contrary to Defendants' representations and promises as to the products' outstanding quality, long life, and great durability and reliability, the "plumbing systems" are an unmitigated disaster. Indoor plumbing in this country is ordinarily expected to last at least four decades, but Defendant's plastic water delivery systems have an unusually high failure rate.

44.    Plaintiff's and Class members' structures and other real property improvements contain or did contain PB pipe and acetal fittings manufactured from materials sold and supplied by Shell and Celanese. Shell and Celanese impliedly warranted that the materials from which the PB pipe and acetal fittings were fabricated were of merchantable quality, fit for the ordinary purposes of such materials, and suitable or the particular purposes for which they were intended.

45.    The plastic water delivery systems installed in the structures and other improvements to real property owned by Plaintiff and the Class have failed and/or are failing. The PB pipe and acetal fittings are degrading, cracking, leaking, and spraying water, have done so in the past, or are likely to do so in the near future, in each event causing substantial damages to Plaintiff's and the Class members' property. Defendants knew or should have known that the polybutylene used in the pipe and the resins used in the acetal fittings degrade or corrode and fail when exposed to the chemicals found in ordinary drinking water, and that the plastic water delivery systems could not practically or feasibly be installed in a fashion providing a leak-free environment.

11

46.     Plaintiff has subsequently discovered that problems with PB pipe and fittings were in no way isolated to her home.  Prior to and during installation of the exterior and interior PB plumbing systems, Shell and Celanese became aware or should have been aware that the pipe and acetal fittings were not inert, as they had represented, but were in fact subject to chemical and oxidative attack, resulting in the breakdown of the pipe and acetal filling material itself. This process was assisted and accelerated by polybutylene's inherent inability to withstand stresses normal to the installation of plumbing pipe.

47.     Plaintiff was not able to discover immediately the cause of and entities responsible for the failures of their PB pipes and acetal fittings.  Plaintiff has now learned that the acetal fittings used to connect the PB pipe to their plumbing systems are subject to attack by the chlorine contained in potable water and/or other degradation (particularly when stressed), and that these acetal fittings have begun to degrade.

48.     Shell and others completely failed to advise regulatory bodies that they were already aware of significant problems with acetal fittings, which stemmed from fitting design and the unsuitability of Celcon as material for that application.  In fact, Shell had already begun looking for alternate materials and referred internally to Celcon insert fittings as the "acetal albatross."  Had this significant and material data been disclosed, the regulatory bodies would not have continued to approve acetal fittings.  Plaintiff's home would not have been constructed with these fittings, nor with PB pipe. In the interest of maximizing profits, Shell and the other manufacturers conspired to intentionally deceive the regulatory bodies and the consuming public, knowing that their actions would eventually cause the types of damage giving rise to this action.

49.     As a direct and proximate result of the negligent, reckless, and/or intentional and fraudulent acts, misrepresentations, and omissions of Defendants, Plaintiff and Class members

have been damaged and have been or will in the future be forced to replace all of the acetal fittings and PB pipe in their structures and other improvements to real property.

50.     Plaintiff and the Class members have been forced or will be in the future forced to undertake additional repairs, if feasible, including (but not limited to) the repair and replacement of fittings, pipe, and other components, as well as sheet-rock, flooring, woodwork, carpet, wallpaper, painting, paving, landscaping, and other items of realty and fixtures appurtenant thereto.

51.     This action is not barred by Arkansas's construction statute of repose, Ark. Code Ann. § 16-56-112(a), as the pipe and fittings are mass produced, fungible goods and Defendants are manufacturers who played no role in its installation in Plaintiff's and Class members' structures. *See, e.g., Brown v. Overhead Door Corp.*, 843 F. Supp. 482, 490 (W.D. Ark. 1994); 2 David Newbern, *et al.*, Arkansas Civil Prac. & Proc. § 5:11, Statutes of Repose (5th ed.).

## COUNT ONE
## VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (On Behalf of the Arkansas Subclass)

52.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

53.     This cause of action is brought pursuant to the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq*. (the "ADTPA"), which prohibits "deceptive and unconscionable trade practices," defined specifically as the "act, use, or employment by any person of any deception, fraud, or false pretense," or the "concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression or omission," the in connection with the sale or advertisement of goods or services. *Id.* § 4-88-108 & -109.

54.     The ADTPA is a remedial statute which is to be liberally construed.

55.     The PB piping systems are goods and Defendants, Plaintiff, and the Arkansas Subclass members are persons within the meaning of the ADTPA. *See id.* § 4-88-102. Plaintiff and each Arkansas Subclass members has suffered "actual damage or injury" within the meaning of the ADTPA. *Id.* § 4-88-113(f).

56.     Defendants, in connection with the sale and advertisement of merchandise, engaged in deceptive and unconscionable trade practices in violation of the ADPTA when they marketed the subject water delivery systems, which they knew contained material defects and would fail prematurely under normal use, and omitted to disclose to Plaintiff and Arkansas Subclass members the adverse material facts concerning the defective nature of these systems. These defects directly interfered with Plaintiff's and the Arkansas Subclass members' reasonable expectations concerning the performance of such systems.

57.     In addition, Defendants' failures to disclose the subject defects constituted deceptive and/or unconscionable trade practices because Defendants knew such facts would be unknown to and not easily discoverable by Plaintiff and the other Arkansas Subclass members and would defeat their ordinary, foreseeable, and reasonable expectations concerning the normal performance of their water delivery systems.

58.     Shell made the following deceptive and misleading oral and written statements regarding the plastic water delivery systems which had the tendency and/or effect of deceiving and misleading Plaintiff and the Class:

    a.  "Pipe made with Duraflex polybutylene resin from Shell Chemical Company is the toughest and the most economical plumbing you can buy.";

    b.  "When you match Duraflex pipe against copper, galvanized, CPVC or any other plumbing material used for hot and cold water service you'll see there's no comparison. You won't find a better pipe for homes, townhouses and apartment buildings at any price."

14

c.  PBWS pipe made from Shell polybutylene resin can reduce costs by more than 50% over copper pipe;

d.  "Duraflex pipe is tough – tougher than any other plumbing pipe. It resists corrosion, rust, scale and freezing";

e.  "Pipe made with Duraflex polybutylene resin offers added protection because it won't corrode, rust or rot. Duraflex resin is inert, so it resists the corrosive elements in water that can eventually eat holes in metallic pipe.";

f.  Polybutylene pipe extruded from Duraflex resin was suitable for use with chlorinated municipal water;

g.  Polybutylene pipe made from Shell polybutylene resin has been in use for more than ten years and its record has been excellent;

h.  Polybutylene pipe can provide your city or water district with long-lasting, high performance water service;

i.  Shell polybutylene resin offers a unique combination of flexibility, toughness, stress crack resistance and creep resistance that makes it particularly suitable as a base material for polybutylene applications;

j.  The quality of polybutylene pipes can be determined by conducting a relatively simple quick-burst test;

k.  Compression fittings normally used with copper tubing can be employed to connect polybutylene pipe to corporation and curb stops;

l.  Pipe extruded from Shell polybutylene resin should have a useful service life of at least 50 years;

m.  Acetal insert fittings are widely used and well proven;

n.  Acetal insert fittings are suitable for interior plumbing connections and should be approved for use;

o.  All problems with acetal insert fittings have been discovered and solved;

p.  The lack of an inexpensive insert fitting system will severely limit the use of polybutylene tubing in plumbing applications; and

q.  The acetal insert crimp fitting system was suitable for easy and reliable connections.

59.    Celanese made the following false and misleading oral and written statements

regarding Celcon resin and Celcon fittings, which had the tendency and/or effect of deceiving and misleading Plaintiff and the Class:

      a. Celcon was suitable for molding into fittings for plumbing applications;

      b. Fittings molded from Celcon are not adversely affected by chlorine found in potable water;

      c. Fittings molded from Celcon had performed satisfactorily in potable water applications for over 18 years; and

      d. Fittings molded from Celcon could withstand the stresses caused by the crimp system of piping joints.

60.     Defendants specifically failed to disclose, among other things, that:

      a. The pipe should be sleeved when passing through foundations;

      b. Kinking and bending stresses contributed to accelerate oxidative and chemical attack;

      c. The anti-oxidants added to the pipe would be consumed or leached out in actual service leading to embrittlement and failure of the pipe;

      d. Regardless of installation instructions, the stresses caused by connection at any rigid or fixed point rendered the pipe material particularly susceptible to failure through oxidative or chemical attack;

      e. The presence of chlorinated water at even normal levels in municipal water would adversely affect both the pipe material and the Celcon fittings accelerating failure through oxidative and chemical attack;

      f. The pipe material was sensitive to notching and cracking such that stresses generated by normal installation would cause failure through oxidative or chemical attack;

      g. The pipe, despite express representations to the contrary, was not inert and would corrode or oxidize;

      h. The acetal resins would hydrolyze and be affected by the presence of chlorinated water at even normal levels in municipal water; and

      i. The fittings molded from acetal resins could not withstand the stresses of even properly applied crimps in the pipe joining system.

61.     As a result of these unfair or deceptive trade practices of these Defendants under

16

the Act as set out above, Plaintiff and the Class have suffered damages.

## COUNT TWO
### NEGLIGENCE

62.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

63.     Shell and Celanese, as design professionals and manufacturers of the product in question, had a duty to use ordinary care in designing, formulating, manufacturing, testing, selecting, and marketing the plastic water delivery systems in order to protect users thereof from unreasonable risks of harm associated with the systems' intended and reasonably foreseeable uses.

64.     Shell and Celanese, as design professionals and manufacturers of the product in question, had a duty to give reasonable and adequate warning of the latent dangers inherent in the plastic water delivery systems' intended use and to furnish reasonable and adequate instructions with respect to the conditions and methods for the systems' safe use.

65.     Shell and Celanese violated these duties in that the plastic water delivery systems did not carry adequate warnings and instructions for use and were defectively designed, formulated, and manufactured, such that the systems were and are unsafe for reasonably foreseeable use.

66.     As a direct and proximate result of the Defendants' negligence without any negligence of Plaintiff contributing thereto, Plaintiff and Class Members have suffered damages.

## COUNT THREE
### STRICT LIABILITY

67.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

17

68.    Defendants were engaged in the business of formulating, designing, and manufacturing PB resin, pipes, and acetal fittings

69.    Defendants placed the PB resin, pipes, and acetal fittings into the stream of commerce knowing and expecting that they would reach Plaintiff and the Class members, as said products' ultimate users and consumers.

70.    The Shell PB resin in the form of polybutylene pipe, as formulated, manufactured, designed, and sold by Shell, was in a defective and unreasonably dangerous condition, in that it failed to perform as represented and intended and as reasonably expected by Plaintiff and the Class Members, as the PB resin and pipe were defectively formulated, designed, and manufactured.

71.    The Celcon fittings, as formulated, manufactured, designed, and sold by Celanese, were in a defective and unreasonably dangerous condition, in that they failed to perform as represented and intended and as reasonably expected by Plaintiff and the Class Members, as the Celcon material and fittings were defectively formulated, designed, and manufactured.

72.    Plaintiff and the Class Members have been subjected to a significant risk of injury and/or property damage as a result of Defendants' actions.

73.    As a direct and proximate result of the products' defective condition and of Defendants' breaches of duties owed to Plaintiff and Class members as foreseeable users and consumers of the products, Plaintiff and Class members have suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, pray that this case be certified and maintained as a class action and for judgment to be entered upon Defendants as follows:

1.      For compensatory and other damages;

2.      For restitution and other relief;

3.      For actual damages sustained or treble damages;

4.      For injunctive and declaratory relief;

5.      For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

6.      For such other and further relief as this Court deems just and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: November 20, 2017                    Respectfully submitted,

Chris A. Averitt
AR Bar No. 98123
SCHOLTENS & AVERITT, PLC
600 South Main Street
Jonesboro, AR 72401
Tel:    870-972-6900
Fax:    870-972-6903
chris@scholtensaveritt.com

Jay P. Dinan
Daniel Calvert
Elliott Tubbs III
PARKER WAICHMAN LLP
27300 Riverview Center Blvd, Suite 103
Bonita Springs, FL 34134
Tel:    239-390-1000
Fax:    239-390-0055
jdinan@yourlawyer.com
dcalvert@yourlawyer.com
etubbs@yourlawyer.com
pwflpleadings@yourlawyer.com

EXHIBIT

A

IN THE CHANCERY COURT FOR OBION COUNTY, TENNESSEE

AT UNION CITY, TENNESSEE

TINA COX, CHARLES HOMER )
CLOAR, MARY H. CLOAR, MELODY )
ALFORD, COUNTRY VILLAGE )
MOBILE HOME PARK, and PHYLLIS )    Civil Action No. 18,844
BIRMINGHAM, individually and on )
behalf of all other individuals and )
entities similarly situated, )    CLASS ACTION
 )
            Plaintiffs, )
 )
    v. )
 )    OBION COUNTY
SHELL OIL COMPANY, D/B/A SHELL )
CHEMICAL COMPANY, and HOECHST )
CELANESE CORPORATION, )
 )
            Defendants. )
_____ )

**FILED**

July 31, 1995

PAULA RICE, CLERK & MASTER

2:05 PM          D C & M

EX. B

---

### ORDER GRANTING PRELIMINARY APPROVAL TO PROPOSED SETTLEMENT, APPROVING CLASS ACTION SETTLEMENT NOTICE PROGRAM

---

        The parties have submitted a proposed Settlement for the preliminary

consideration of this Court.  The proposed Settlement establishes a

comprehensive polybutylene pipe repair, re-plumbing and reimbursement

program, addressing past, present and future damage, which is designed to

provide Class Members substantial economic and tangible benefits.  The

Settlement provides an initial funding commitment by defendants, in the

aggregate amount of $850 million, to provide repairs, replumbing and/or

reimbursement of past and future repair costs and property damage resulting

from the allegedly defective polybutylene pipe that is the subject matter of this

certified class action.  The Settlement's benefits to the Class, the procedures and

protocol for claims, and all other terms and conditions are more fully set forth in

a written Settlement Agreement lodged with the Court. The Settlement's essential

terms shall be summarized, and date of the fairness hearing and the procedures

and deadlines for comments, objections, claims, or exclusions from the Class shall be set forth in proposed forms of notice to be submitted by the parties to this Court for its approval.

The parties propose to conduct a comprehensive nationwide campaign of individual notice and multimedia publication through national and local newspapers and periodicals, television and radio, press conferences, press releases, and the Internet.  Class Counsel shall prepare forms of Notice pursuant to their Notice Program and submit forms of Notice to this Court forthwith.

The Court has considered the presentations of counsel regarding the proposed Settlement in light of the requirements of Tenn. Civ. Proc. Rule 23.05 regarding the compromise of class actions, and the preliminary approval criteria of the Manual for Complex Litigation 3d (Federal Judicial Center 1995) § 30.4, which provides procedural guidance on the conduct of the settlement approval process in complex or large scale actions.

This Court finds that the proposed Settlement meets the criteria for preliminary approval and articulated in the Manual for Complex Litigation 3d § 30.41.  Specifically, this Court's "preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval."  Id.

This Court further finds that, upon preliminary evaluation, the proposed Settlement substantially fulfills the purposes and objectives of this action, and provides substantial benefits to the class, without the costs, risks and delays of further litigation at the trial and appellate levels, and without requiring a finding or admission of liability by defendants.

-2-

Subject to further review of the specific details of the <u>Notice</u> <u>Program</u>, and the forms of Notice developed by the parties, to confirm that they meet the criteria of Tenn. Civ. Proc. Rule 23.03(2) and communicate the information required by the Rule, this Court finds that the <u>Notice Program</u> outlined in Exhibit A is designed to provide individual notice to all known Class members and all Class members who can be identified through reasonable efforts as well as to provide comprehensive nationwide multimedia notice to the Class, and thus constitutes the best notice practicable under the circumstances of this action.

IT IS, THEREFORE, ORDERED BY THE COURT, that:

1.    <u>Preliminary Settlement Approval</u>.

The proposed Settlement between the plaintiff class and the defendants appears to be within the range of reasonableness, is granted preliminary approval, and accordingly shall be submitted to the Class members for their consideration and for a hearing under Tenn. Civ. Proc. Rule 23.05;

2.    <u>Class Definition</u>.

The Plaintiff Class shall be defined, for purposes of the proposed settlement and <u>Notice</u> thereunder, as:

> All persons and entities that (1) own structures and/or improvements to real property in the United States in which there is a polybutylene plumbing system, (2) own or previously owned such structures and/or improvements to real property and have already incurred any cost or expense, by reason of leakage from, or from failure, repair, or removal of, all or any portion of a polybutylene plumbing system, or (3) will own such structures and/or improvements during the term of entitlement to relief under the Settlement Agreement.

> The Settlement Class definition excludes:

> (1) all claims for personal injury and associated emotional distress, (2) all compensatory claims by any person who is not an Eligible Claimant under the Settlement or who is named as a plaintiff in any civil action related to the subject matter of this litigation which is pending as of July 29, 1995 or is commenced prior to final judgment

herein, (3) all parties to <u>Geno Cioe, et al. v. Shell Oil Company</u>, et al., Case No. 662214, and <u>Robert L. Williams, et al. v. Shell Oil Company, et al.</u>, Case No. 658403, and related combined actions (Cases Nos. 640245, 654709, 656787, 661372, 665521 and 665527) in the Superior Court of the State of California in and for the County of San Diego, and all members of the certified classes in such lawsuits; and (4) Defendants and other persons released under the Settlement.

The Settlement Class definition may be amended to promote the Settlement and conform to the <u>Settlement Agreement</u>, with notice to the Class, and prior to entry of any final settlement approval order.  Any certification of a preliminary or final Settlement Class under this Order is for settlement purposes only, and shall not constitute, and shall not be construed as, an admission on the part of any defendant that this action, or any other proposed or certified class action is appropriate for trial class treatment pursuant to Tenn. Civ. Proc. Rule 23 or any similar class action statute or rule.  Entry of this Order is without prejudice to the rights of defendants to (a) oppose certification in this action, and seek decertification or modification of the Class as certified in the order of June 13, 1995, should the Settlement not be approved or implemented for any reasons, or (b) oppose certification in any other proposed or certified class action.

EXHIBIT

B

IN THE CHANCERY COURT FOR OBION COUNTY, TENNESSEE

AT UNION CITY, TENNESSEE

|  |  |  |
|---|---|---|
| TINA COX, CHARLES HOMER<br>CLOAR, MARY H. CLOAR, MELODY<br>ALFORD, COUNTRY VILLAGE<br>MOBILE HOME PARK, and PHYLLIS<br>BIRMINGHAM, individually and on<br>behalf of all other individuals and entities<br>similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>SHELL OIL COMPANY, D/B/A SHELL<br>CHEMICAL COMPANY, and HOECHST<br>CELANESE CORPORATION,<br><br>           Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 18,844<br>Class Action |

**FILED**

July 31, 1995

PAULA RICE, CLERK & MASTER

2:05 p.m.    D C & M

## SETTLEMENT AGREEMENT

THIS AGREEMENT is entered into this ____ day of _____, 1995, by and among (1) the plaintiffs in the above litigation, Tina M. Cox, Charles Homer Cloar, Mary H. Cloar, Melody Alford, Country Village Mobile Home Park, and Phyllis Birmingham, and Robert R. Beeman, Robert J. Valero, RAL Yield & Equities IV Limited Partnership, and RAL Income & Equity Growth V Limited Partnership, who are the plaintiffs in *Robert R. Beeman, et al. v. Shell Oil Company, et al.*, ("*Beeman*"), No. G 95 214 in the United States District Court for the Southern District of Texas, Houston Division (collectively "Plaintiffs"), for themselves and on behalf of the plaintiff class as hereinafter defined ("Settlement Class"); and (2) the defendants in the above litigation and in *Beeman*, Shell Oil Company d/b/a Shell Chemical Company and Hoechst Celanese Corporation ("Defendants"). The Defendants and Plaintiffs, collectively, shall hereinafter be referred to as the "Parties."

Subject to Court approval as required by the Tennessee Rules of Civil Procedure and as hereinafter provided, it is hereby stipulated and agreed by the Parties that, in consideration of the promises and covenants set forth in this Agreement and upon the entry by the Court of a Final Order and Judgment approving the settlement and directing the implementation of the terms and conditions of the settlement as set forth in this Agreement, this action shall be settled and compromised upon the terms and conditions contained herein.

1.    **Definitions**

As used in this Agreement and in the exhibits annexed hereto, in addition to any definitions elsewhere in this Agreement, the following terms shall have the meanings set forth below:

**Acetal Fitting** means a plastic insert fitting made of acetal resin manufactured by one of the Defendants.

**Action** means the above-captioned matter, Civil Action No. 18,844 pending in the Chancery Court for Obion County at Union City, Tennessee.

**Agreement** means this Settlement Agreement, including all exhibits hereto.

**Consumer Plumbing Recovery Center (CPRC)** and **Consumer Plumbing Recovery Center Document (CPRC Document)** mean, respectively, the claims resolution facility established in accordance with Section 11 of this Agreement and the Consumer Plumbing Recovery Center Document, attached hereto and incorporated herein as Exhibit A, and approved by the Court to administer relief provided for under the terms of this Agreement.

**Court** means the Chancery Court for Obion County at Union City, Tennessee.

**Date of Installation** means the respective date that a PB Plumbing System or PB Yard Service Line was installed.  In the absence of proof of such date, the Date of Installation for a Type I Unit will be presumed to be the date of the certificate of occupancy issued for such Unit, and for a Type II Unit, the latest of the date of the first state motor vehicle registration, the date of the first consumer sale, or the date of manufacture of such Unit.

**Eligible Claimant** means a claimant that qualifies for relief under Section 6.1 of this Agreement.

**Final Order and Judgment** means the Order to be entered by the Court, in a form which is mutually agreeable to the Parties, approving this Agreement without material alterations, as fair, adequate and reasonable under Tenn. R. Civ. P. 23.05, confirming the Settlement Class certification under Tenn. R. Civ. P.  23.01, 23.02(3) and 23.05, and making such other findings and determinations as the Court deems necessary and appropriate to effectuate the terms of this Agreement.

**First Opt Out Period** means the period commencing on the Initial Notice Date and extending for a reasonable period of time to be set by the Court.

**Fairness Hearing** means the hearing to be conducted by the Court in connection with the determination of the fairness, adequacy and reasonableness of this Agreement under Tenn. R. Civ. P. 23.05.

**Funding Agreement** means the document described in Section 4 of this Agreement governing the timing, amount and terms of each Defendant's obligation to make payments in accordance with this Agreement.

**Initial Notice Date** means the first date upon which notice is mailed to the Settlement Class pursuant to Section 8 of this Agreement.

**Insurer** means an insurance company that issued an insurance or reinsurance policy to a Defendant or a Released Manufacturer.

**Leak** means any verifiable failure in any component of a PB Plumbing System leading to an unwanted discharge of water exclusive of (i) a leak in the first year of any applicable warranty period provided by the Unit's builder, contractor or manufacturer; (ii) a leak resulting from abuse of such system or circumstances unrelated to ordinary use of such system, including acts of nature (e.g., fire, flood, hurricane, tornado, etc.); (iii) a leak that may be repaired without cutting the wall in or at (a) a valve, or (b) a riser (which is the connecting line from a shut-off valve to a fixture) or an adapter to a fixture; and (iv) a leak in an ice maker line.

**PB Plumbing System** means that portion of any potable water distribution system with an Installation Date between January 1, 1978, and the date hereof, which is within a structure and is composed of Polybutylene Pipe with Acetal Fittings or metal insert fittings (or any combination thereof). PB Plumbing System does not include PB Yard Service Line.

**PB Yard Service Line** means that portion of any potable water distribution system with an Installation Date between January 1, 1978, and the date hereof, which extends from the water company cut off valve to the transition to the inside plumbing system in or at the structure (excluding the meter) and which is composed of Polybutylene Pipe with or without metal or Acetal Fittings.

**Person** means both an individual and an entity.

**Plaintiffs' Class Counsel** means the following counsel:

Don Barrett, Esq.; Gordon Ball, Esq.; Michael A. Caddell, Esq.; David H. Weinstein, Esq.; Trial Lawyers for Public Justice, P.C.; Conley, Campbell, Moss & Smith; Lieff, Cabraser, Heimann & Bernstein; Cohen, Milstein, Hausfeld & Toll; Hagens & Berman; Heins Mills & Olson, P.L.C.; Jackson, Taylor & Martino; Patrick Pendley, Esq.; Phillip Feliciano, Esq.; Moore & Brown; Thomas Jessee, Esq.; Carey & Danif, L.L.C.; Levin, Fishbein, Sedran & Berman; Moriarty & Associates, P.C.; Caddell & Conwell, P.C.; Weinstein Kitchenoff Scarlato & Goldman Ltd; Kohn, Swift & Graf, P.C.; Law Offices of Marc D. Murr, P.C.; Bristow, Hackerman, Wilson & Peterson, P.C.; Law Offices of Dennis C. Burns; and Law Offices of Charles E. Dorr, P.C.

**Polybutylene Pipe** means potable water pipe or tubing made from polybutylene resin manufactured and/or sold by Shell Oil Company.

**Preliminary Approval** means the Court's conditional certification of the Settlement Class, preliminary approval of this Agreement, approval of the form of the Initial Notice pursuant to Tenn. R. Civ. P. 23.02(3), Rule 23.03 and Rule 23.05 (or the setting of a date for the approval or submission for approval of the form of the Initial Notice), and entry of an order substantially in the form of Exhibit B, hereto.

**Proof of Claim Form** means the form which shall be completed by Settlement Class members pursuant to the terms of this Agreement.

**Released Manufacturer** means and is limited to a Person that is listed on Exhibit C, attached hereto.

**Replumb** means the (i) replacement of a Unit's PB Plumbing System with a copper, CPVC or other equivalent non-polybutylene plumbing system that conforms to all applicable codes and standards, and (ii) repair of access damage to return that Unit's premises, as nearly as practicable, to the condition existing prior to the Replumb, all as shall be more particularly described in guidelines to be adopted by the CPRC.

**Settlement Amount** means the aggregate amount the Defendants and other Contributing Parties are obligated to pay under Section 4 of this Agreement.

**Settled Claim** means any claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description which the Releasing Party, as described in Section 15 of this Agreement, has or may have, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could have been or in the future might be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any or all of the Defendants or Released Manufacturers, arising from or in any way relating to any defects or alleged defects of a PB Plumbing System or PB Yard Service Line or any part thereof. Without limiting the generality of the foregoing, Settled Claim shall include, with regard to the foregoing subject matter:

(1) any claim for breach or violation of any federal, state, common or other law;

(2) any claim for breach of any duty imposed by law, by contract or otherwise;

(3) any claim based on strict product liability, negligence, breach of express or implied warranty, racketeering, fraud, conspiracy, consumer fraud, negligent misrepresentation, or intentional misrepresentation;

(4) any claim arising from or in any way related to the promotion, manufacture, production, sale, distribution, assembly or installation of PB Plumbing Systems or PB Yard Service Lines, any individual Unit's PB Plumbing System or PB Yard Service Line, and/or any alleged defects in a PB Plumbing System, PB Yard Service Line, or any part thereof; and

(5) any claim for emotional distress or mental anguish associated with any of the above.

However, Settled Claim does not include any claim for bodily injury (including wrongful death) and associated emotional distress and mental anguish.

Settlement Class means a class composed of all Persons who own, have owned, or will own a Unit at a time during which a Qualifying Leak or a Qualifying Yard Service Leak under Section 6.1 could occur in that Unit and who are given notice in accordance with the due process clause of the U. S. Constitution.

Excluded from the Settlement Class are:

(1)    All Persons who, in accordance with the terms of this Agreement, execute a timely request for exclusion from the Settlement Class;

(2)    The Defendants; the Released Manufacturers; the parent and any subsidiary, affiliate and controlled entity of any of them; and the officers and directors of each of them; and

(3)    All parties to *Geno Cioe, et al. v. Shell Oil Company, et al.*, Case No. 662214, and *Robert L. Williams, et al. v. Shell Oil Company, et al.*, Case No. 658403, and related combined actions (Cases Nos. 640245, 654709, 656787, 661372, 665521 and 665527) in the Superior Court of the State of California in and for the County of San Diego, and all members of the certified classes in such lawsuits.

Settlement Date means the date on which all of the following have occurred: (a) the entry of the Final Order and Judgment without material modification and (b) the achievement of finality for the Final Order and Judgment by virtue of that Order having become final and non-appealable through (i) the expiration of all appropriate appeal periods without an appeal having been filed; (ii) final affirmance of the Final Order and Judgment on appeal or final dismissal or denial of all such appeals, including petitions for review, rehearing or certiorari; or (iii) final disposition of any proceedings, including any appeals, resulting from any appeal from the entry of the Final Order and Judgment.

Settlement Fund means the fund established in accordance with the terms of Section 4 of this Agreement.

**Subsequent Notice Date** means the first date upon which notice is mailed pursuant to Section 9 of this Agreement in each of the years specified in Section 9.

**Subsequent Opt Out Period** means the period commencing on a Subsequent Notice Date and extending for a reasonable period of time to be set by the Court.

**Unit** means any real property or structure, or part thereof as described below, situated in the United States with a PB Plumbing System or PB Yard Service Line. A **Type I Unit** is a single family site-built or modular residence, a single family dwelling unit in a duplex, triplex or quadruplex dwelling, a single-family unit in a condominium, a single family townhouse unit in a townhouse development, an apartment in an apartment building or complex, and each part of a commercial or other structure (e.g., a public or governmental structure, office building, store, shopping center, retail mall, factory, workshop, warehouse, garage, library, auditorium, museum, hospital, club, or public or private school, college or university) occupied by a single tenant or tenant group. When a structure other than a single family dwelling includes a common area with plumbing service, such as a common area restroom, laundry room, recreation room, clubhouse or communal kitchen, or plumbing servicing more than one unit, each such discrete area or plumbing system shall be considered to constitute an individual Unit separate and distinct from the other individual Units in the structure. A **Type II Unit** shall mean a mobile home. Unit does not include boats, recreational vehicles, travel trailers, or other motorized vehicles or vehicles intended for regular use on public roads, nor shall it include any aspect of any municipal or other water service system upstream from the water company cutoff valve.

As used in this Agreement, a single family unit is a unit ordinarily expected to be occupied by a single family, irrespective of the relationship, if any, between or among the actual occupants.

**Unreimbursed Cost** means, to the extent not reimbursed or paid by another Person (including but not limited to a Defendant or a private insurance company): (i) the documented actual cost, paid or to be paid, of reasonable and necessary repairs actually

performed, (ii) the estimated cost of reasonable and necessary repairs if documentation is not available or repairs have not been performed, or (iii) the documented value of property destroyed or not economically repairable where documents exist, otherwise actual cash value.

**Withdrawing Defendant** means a Defendant that has withdrawn from this settlement pursuant to Section 12 of this Agreement.

**Yard Service Leak** means any verifiable failure in any component of a PB Yard Service Line leading to an unwanted discharge of water from the PB Yard Service Line, exclusive of (i) a leak in the first year of any applicable warranty period provided by the Unit's builder, contractor or manufacturer; (ii) a leak resulting from abuse of such system or circumstances unrelated to ordinary use of such system, including acts of nature (e.g., fire, flood, hurricane, tornado, etc.); and (iii) a leak in the meter or any portion of the system not owned by the Settlement Class member.

**Yard Service Line Replacement** means the (i) replacement of a PB Yard Service Line with a PVC or other equivalent non-polybutylene yard service system that conforms to all applicable codes and standards and (ii) repair of the premises to return the premises, as nearly as practicable and reasonable, to the condition existing prior to the Qualifying Yard Service Leak, as defined in Section 6.1.3 of this Agreement, as is more particularly described in the CPRC Document and guidelines to be adopted by the CPRC.

2.      **Settlement Purposes Only.**

2.1. This Agreement is for settlement purposes only, and neither the fact of, nor any provision contained in, this Agreement nor any action taken hereunder shall constitute, be construed as, or be admissible in evidence as, any admission of the validity of any claim or any fact alleged by Plaintiffs in this Action or in *Beeman* or of any wrongdoing, fault, violation of law, or liability of any kind on the part of any of the Defendants or Released Manufacturers or any admission by any of them of any claim or allegation made in this Action or in *Beeman*, nor as an admission by any of the Plaintiffs, members of the

practicable, the CPRC shall accord claims priority in the order received, in accordance with the terms of the CPRC Document.

5.2.  Once 80% of the Settlement Amount has been expended, Replumbs and Yard Service Line Replacements shall continue to be performed in accordance with Section 5.1, however, cash payments to Eligible Claimants under Section 6.2 will be made as of the end of that year, and as of the end of each subsequent year, after payments have been made for all other amounts payable in such year under the terms of this Agreement.

**6.    Recovery Program.**

6.1.  Only Settlement Class members described in this Section 6.1 are eligible for relief in accordance with Section 6 of this Agreement.  A Settlement Class member may qualify as an Eligible Claimant under one or more of the subsections of this Section 6.1.

6.1.1.  Any Settlement Class member shall be an Eligible Claimant if a Leak occurs in his Unit within (a) one year after the Initial Notice Date, or (b) 13 years after the Date of Installation for a Type I Unit's PB Plumbing System or (c) 10 years after the Date of Installation for a Type II Unit's PB Plumbing System.  Such a Leak is a "Qualifying Leak".

6.1.2.  With respect to a PB Plumbing System composed of Polybutylene Pipe and metal insert fittings in a single-family site-built or modular residence, a unit in a duplex, triplex, or quadruplex dwelling, a single-family unit in a condominium, or a single-family townhouse unit in a townhouse development, any Settlement Class member shall be an Eligible Claimant if a Leak occurs in such system within (a) one year after the Initial Notice Date, or (b) before the earlier of (i) 16 years after the Date of Installation of such PB Plumbing System or (ii) March 10, 2007.  Such a Leak is a "Qualifying Leak".

6.1.3.  Any Settlement Class member shall be an Eligible Claimant if a Yard Service Leak occurs in his Unit within (a) one year after the Initial Notice Date, or (b) 10 years after the Date of Installation for a PB Yard Service Line for owners of Type I or Type II Units. Such a Leak is a "Qualifying Yard Service Leak".

6.1.4. Any Settlement Class member shall be an Eligible Claimant if he has incurred damage (a) to tangible property located in his Unit (including damage to the structure thereof), if the damage has resulted from a Qualifying Leak not in his Unit; or (b) to his Unit's structure or personal property located therein, if the damage has resulted from a Qualifying Yard Service Leak not in his Unit.

6.2.   **Recovery for Expenses Resulting From a Qualifying Leak or a Qualifying Yard Service Leak.**

6.2.1. Subject to Section 4.5.1 of this Agreement, each Eligible Claimant described in Sections 6.1.1 and 6.1.2 shall be entitled to receive from the Settlement Fund reimbursement of the Unreimbursed Cost of: (a) repairing Qualifying Leaks (including repair of access damage) in the PB Plumbing System in such Claimant's Unit; and (b) any physical damage to such Claimant's tangible property directly resulting from a Qualifying Leak in such Claimant's Unit (collectively, "Leak Expenses"). However, such Claimant shall not be entitled to reimbursement for damage to the extent such damage results from the Claimant's failure to make reasonable efforts to mitigate.

6.2.2. Subject to Section 4.5.1 of this Agreement, each Eligible Claimant described in Section 6.1.3 shall be entitled to receive from the Settlement Fund reimbursement of the Unreimbursed Cost of: (a) repairing Qualifying Yard Service Leaks (including repair of access damage) in, or replacing, the PB Yard Service Line serving such Claimant's Unit; (b) any physical damage to such Claimant's structure or personal property within such structure, directly resulting from a Qualifying Yard Service Leak and (c) returning the premises, as nearly as practicable and reasonable, to the condition existing prior to the Qualifying Yard Service Leak as is more particularly described in the CPRC Document and guidelines to be adopted by the CPRC (collectively "Yard Service Leak Expenses"). However, such Claimant shall not be entitled to reimbursement for damage to the extent such damage results from the Claimant's failure to make reasonable efforts to mitigate.

6.2.3.  Subject to Section 4.5.1 of this Agreement, each Eligible Claimant described in Section 6.1.4 shall be entitled to receive from the Settlement Fund reimbursement of the Unreimbursed Cost of the damage described in Section 6.1.4.  However, such Eligible Claimant shall not be entitled to reimbursement for damage to the extent such damage results from the Eligible Claimant's failure to make reasonable efforts to mitigate.

6.3.    **Replumb for Qualifying Leaks.**

6.3.1.  In addition to the relief provided in Section 6.2, an Eligible Claimant described in Sections 6.1.1 and 6.1.2 in whose Unit a Qualifying Leak occurs on or after the Initial Notice Date shall be entitled to a Replumb of that Unit.

6.3.2.  In addition to the relief provided in Section 6.2, an Eligible Claimant described in Sections 6.1.1 and 6.1.2 in whose Unit two or more Qualifying Leaks have occurred before the Initial Notice Date shall be entitled to a Replumb of that Unit.

6.4     **Exceptions.**

6.4.1.  Excluded as a Qualifying Leak for relief under Section 6.3.1 or 6.3.2 of this Agreement are (a) for all PB Plumbing Systems, a Hot Water Heater Leak if it is the first Leak in the Unit and (b) for a PB Plumbing System described in Section 6.1.2 (but not in Section 6.1.1) of this Agreement, the first Leak (or the first Leak after a Hot Water Heater Leak) in such system if such Leak is not in the pipe ("in the pipe" includes cracks, splits, pinholes, etc.), provided the Date of Installation of such System was after January 1, 1989, subject to Section VI. D of the CPRC Document.  A Hot Water Heater Leak is a leak which occurs within six (6) feet of piping measured from the take-off at the Unit's hot water heater and does not require cutting into the Unit's walls, ceilings or floors to repair.

6.5.    **Recovery for Qualifying Yard Service Leaks; Yard Service Line Replacement.**

6.5.1.  In addition to the relief provided in Section 6.2, an Eligible Claimant described in Section 6.1.3 on whose Unit a Qualifying Yard Service Leak occurs on or after the Initial Notice Date shall be entitled to a Yard Service Line Replacement for that Unit.

However, under Section 6.5 of this Agreement, a Leak which occurs outside the exterior walls of the Unit which may be repaired without necessity of excavation or which occurs in a 1.5 inch or greater outer diameter PB Yard Service Line servicing more than one Unit, will not be considered a Qualifying Yard Service Leak. For such Leaks, the Settlement Class member shall be entitled to have such Leak repaired.

6.5.2. In addition to the relief provided in Section 6.2, an Eligible Claimant described in Section 6.1.3 on whose Unit two or more Qualifying Yard Service Leaks have occurred before the Initial Notice Date shall be entitled to a Yard Service Line Replacement for that Unit.

6.6. **Multi-Unit Structures.**

6.6.1. When a claim is made with respect to a multi-Unit structure, the CPRC will conduct an analysis to determine whether acceleration of relief pursuant to Section 7 of this Agreement to accomplish more extensive Replumbs or Yard Service Line Replacements or other corrective work is appropriate because the expenditures on such accelerated work are likely to be more than off-set by savings resulting from the elimination of potential exposure for future Leak Expenses and Replumbs or Yard Service Line Replacements. Under such circumstances, as more fully set forth in Section VIII of the CPRC Document, the CPRC will recommend acceleration pursuant to Section 7 of this Agreement.

6.7. **Warranty for Work Performed.**

Replumbs, Yard Service Line Replacements and any additional repairs or other work performed on a Settlement Class member's Unit under this Agreement shall be accomplished at the direction of the CPRC and in accordance with the terms and conditions to be established by the CPRC. Neither the CPRC nor any of the Defendants or Released Manufacturers warrants workmanship or materials of the contractor(s) performing such work or the suppliers or manufacturers of the materials used. A Settlement Class member shall look solely to the contractors', suppliers' or manufacturers' warranties as the only labor or materials warranty associated with this Agreement or the work.

6.8.    **Filing Deadlines under Compensation Program.**

6.8.1.  All claims made under Section 6.2, 6.3.2 or 6.5.2 of this Agreement in connection with Qualifying Leaks or Qualifying Yard Service Leaks occurring before the Initial Notice Date must be filed with the CPRC no later than one year after the Initial Notice Date.

6.8.2.  All claims made under Sections 6.2 or 6.3.1 for Eligible Claimants under 6.1.1 or 6.5.1 in connection with Qualifying Leaks or Qualifying Yard Service Leaks on or after the Initial Notice Date must be filed with the CPRC on or before the later of: (a) 90 days following one year after the Initial Notice Date for Eligible Claimants under Sections 6.1.1(a) or 6.1.3(a); (b) 14 years after the Date of Installation for Eligible Claimants under Sections 6.1.1(b); or (c) 11 years after the Date of Installation for Eligible Claimants under Sections 6.1.1(c) and 6.1.3(b).

6.8.3.  All claims made under Section 6.2 or 6.3.1 for Eligible Claimants under 6.1.2 in connection with Qualifying Leaks after the Initial Notice Date must be filed with the CPRC on or before (a) 90 days following one year after the Initial Notice Date or (b) the earlier of 17 years after the Date of Installation or September 10, 2007.

6.8.4.  No Claimant shall be entitled to receive any compensation or relief under this Agreement unless the filing deadlines of this Section 6.8 have been met.

6.9.    **Additional Recovery in Special Circumstances.**

6.9.1.  The CPRC shall have the discretion to offer relief in addition to the relief provided for under Section 6 of this Agreement under the circumstances set out in Section VI of the CPRC Document.  Such additional relief shall be administered by the CPRC in accordance with the CPRC Document and the guidelines to be adopted by the CPRC.

7.      **Additional Repair, Replumb and Yard Service Line Replacement.**

7.1.    The CPRC, with concurrence of the Defendants, may offer in accordance with Section VIII of the CPRC Document, a Replumb, Yard Service Line Replacement, repair or component replacement to a Settlement Class member's PB Plumbing System or PB Yard